UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RAMON SANTANA,

                Plaintiff,                      5:12-cv-625
                                                                     (GLS/ATB)

           v.

CITY OF ITHACA, NEW YORK
et al.,

                Defendants.
_____

**APPEARANCES:**                                **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Ramon Santana
Pro Se
604 Spencer Road
Ithaca, NY 14850

**FOR THE DEFENDANTS:**
Office of the City Attorney           PATRICIA M. O'ROURKE, ESQ.
108 East Green Street               KRIN M. FLAHERTY, ESQ.
Ithaca, NY 14850

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff *pro se* Ramon Santana commenced this action against defendants City of Ithaca, New York and Ithaca Building Commissioner

Phyllis Radke, alleging violations of Title VII,[1] 42 U.S.C. §§ 1981 and 1983, New York State Human Rights Law (NYSHRL),[2] and Chapters 55 and 215 of the City of Ithaca Municipal Code (IMC). (*See* 2d Am. Compl., Dkt. No. 22.) Pending is defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (*See* Dkt. No. 23.) For the reasons that follow, the motion is granted in part and denied in part.

## II. **Background**

### A. **Facts**[3]

In the winter of 2006-2007, following five years of employment with the Ithaca Department of Public Works, Santana, a Hispanic male, became a housing inspector with the city's Building Department (IBD). (*See* 2d Am. Compl. ¶¶ 3, 7.) The following summer, along with a senior code inspector, Santana was assigned to conduct housing inspections for Ithaca's "'West End area,'" which he contends comprises fifty percent of the city. (*Id.* ¶¶ 8-9.) Shortly after that assignment, Santana informed

---

[1] *See* 42 U.S.C. §§ 2000e-2000e-17.

[2] *See* N.Y. Exec. Law §§ 290-301.

[3] The facts are drawn from Santana's Second Amended Complaint and presented in the light most favorable to him. (*See* 2d Am. Compl.)

2

Commissioner Radke and a non-party IBD supervisor that "he had too many stacks of files backlogged and was unable to get files off his desk." (*Id*. ¶ 9.)  He made similar complaints to the senior code inspector with whom he shared responsibility for Ithaca's West End area, and noted that five Caucasian IBD employees "were assisting one another in different capacities with the housing inspection assignments in a much geographically smaller area of" Ithaca, resulting in a "disparate workload." (*Id*. ¶¶ 8, 10.)  Despite his protestations, "little to no action was taken," and, in early February 2009, Santana received a "Counseling Letter" containing "various allegations of falling behind in completing files and failing to use the new [IBD] computer systems correctly."  (*Id*. ¶ 10.)  Santana notified Radke again that "files were backlogged on his desk," and, on August 28, 2009, "request[ed] the use of overtime hours or compensatory time to reconcile paperwork for files that were piling up on [his] desk."  (*Id*. ¶¶ 11-12.)  Although Caucasian housing inspectors had been permitted to use overtime hours in similar situations, Santana's request was denied.  (*See id*. ¶¶ 12, 29.)

In addition to being assigned a disproportionate geographical area, Santana was also required by Radke to inspect more units each week than

3

at least one of his Caucasian colleagues. (*See id*. ¶¶ 20, 22.) Radke further required Santana to submit a weekly report indicating the number of units which he inspected each week; a task not demanded of the Caucasian inspectors. (*See id*. ¶ 19.) In June 2010, Radke instructed IBD's front office secretary to fill Santana's schedule with inspections from 10:00 A.M. to 3:00 P.M. daily, and he was no longer allowed to "'block off'" days in order to catch up on paperwork. (*Id*. ¶ 27.) These restrictions applied only to Santana, and, while a Caucasian housing inspector was permitted to adjust his calendar to permit more time to complete paperwork, a similar request submitted by Santana was refused. (*See id*. ¶¶ 27, 30-31.)

At some point during 2009 or 2010, during an open staff meeting, IBD's former Executive Secretary expressed concern about Santana "bringing paperwork to field inspections using [IBD] envelopes." (*Id*. ¶ 15.) When Santana explained to Radke that he "just want[ed] to make sure the paperwork [was not] defaced with grease or dirt when [he gave] it to the customer," Radke responded: "'Ray I know how 'you people' like to go to Burger King on your breaks, I wouldn't want you to get grease on your paperwork." (*Id*.) Furthermore, in January 2010, Santana was falsely

4

accused by Radke and another supervisor of "attempting to alter or forge Excel spreadsheet documents during a meeting." (*Id*. ¶ 18.)

Along with a disproportionate caseload and derogatory remarks, Santana insists that he was subjected to unequal disciplinary standards. In December 2009, he was verbally admonished by Radke "for parking his official City vehicle in front of City Hall." (*Id*. ¶ 14.) During the subsequent three months, a Caucasian senior code inspector parked his City vehicle in the same space on five occasions without warning or discipline. (*See id*.) Santana was also subjected to greater supervisory oversight during home inspections than were his Caucasian colleagues, and, on September 30, 2010, he was terminated for, in part, "ignoring code violations," while the same or similar ignorance by Caucasian inspectors went undisciplined. (*Id*. ¶¶ 32-35.)

**B.    Procedural History**

On April 19, 2012, Defendants moved to dismiss Santana's original Complaint. (*See* Dkt. No. 6.) Santana was subsequently permitted by the court to amend his Complaint on two occasions, and both amendments were followed by defendants' renewal of their motion to dismiss. (*See* Dkt. Nos. 9, 11, 12, 18, 20, 21, 22, 23.) Defendants' most recent motion, which

is presently pending before the court, seeks to dismiss Santana's Second Amended Complaint. (*See* Dkt. No. 23.)

## III. Standard of Review

The standard of review under Fed. R. Civ. P. 12 is well settled and will not be repeated here. For a full discussion of that standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010).

## IV. Discussion

### A. Racial Discrimination Claims

Defendants contend first that Santana's allegations fail to state a valid claim of racial discrimination. (*See* Dkt. No. 23, Attach. 1 at 3-13.) Santana counters, and the court agrees, that he has met his pleading burden. (*See* Dkt. No. 25, Attach. 1 at 3-9.)

"[A] complaint need not establish a prima facie case of employment discrimination to survive a motion to dismiss; however, the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim." *Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010) (internal quotation marks and citation omitted) (reconciling *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *Bell Atl. Corp. v.*

6

*Twombly*, 550 U.S. 544 (2007), and *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

Claims of employment discrimination brought under Title VII, 42 U.S.C. §§ 1981 and 1983, and NYSHRL are subject to a largely identical analytical framework. *See Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012)*; Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010); *see also Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 224-27 (2d Cir. 2004) (articulating differences between Title VII and sections 1981 and 1983). To state a prima facie discrimination claim, the plaintiff must show that: "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz*, 609 F.3d at 491-92.

Where a discrimination claim is predicated on the existence of a hostile work environment, the plaintiff must sufficiently allege that the conduct in question: "(1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's"

7

protected characteristic. *Robinson v. Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012). In determining whether a hostile work environment claim has been established, "courts should examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012) (internal quotation marks and citation omitted).

### 1. *Elements Common to all Race Claims*

Santana alleges that, because he is Hispanic, he was subjected by defendants to both disparate treatment and a hostile work environment under Title VII, 42 U.S.C. §§ 1981 and 1983, and NYSHRL.[4] (*See* 2d Am. Compl.) Despite defendants' arguments to the contrary, Santana's pleading alleges facially plausible claims of discrimination under both theories of liability.

---

[4] Although Santana's NYSHRL claim expressly alleges violation of only N.Y. Exec. Law § 296(6), (*see* 2d Am. Compl. ¶¶ 98-120), which provides for an aiding-and-abetting theory of liability, the court, construing the allegations liberally, as it must, reads the pleading to contain a claim under section 296(1) as well, (*see id.* ¶ 119).

As a Hispanic male who, prior to the period in question, was evaluated as an "outstanding employee," and who was subsequently terminated, Santana satisfies the first three elements of a disparate treatment claim. (2d Am. Compl. ¶¶ 3, 7, 33.) Furthermore, taken together, Santana's allegations that he was: assigned a greater caseload than were his Caucasian colleagues; provided less resources with which to complete that work; reprimanded and terminated under unequal disciplinary standards; and subjected to racially-charged language by Radke, are sufficient to give rise to an inference of discrimination. (*See* 2d Am. Compl.); *Feingold v. New York*, 366 F.3d 138, 152-53 (2d Cir. 2004) (finding evidence of discriminatory intent where workload and disciplinary standards varied markedly along racial lines); *see also Lessambo v. PricewaterhouseCoopers, L.P.*, No. 08 Civ. 6272, 2010 WL 3958787, at *9 (S.D.N.Y. Sept. 27, 2010) ("Further, even stray discriminatory remarks, when combined with other indicia of discrimination like disparate treatment, can raise an inference of discrimination." (internal quotation marks and citations omitted)). Considering the totality of the circumstances, Santana's hostile work environment claim is similarly plausible at this juncture. *See Raniola v. Bratton*, 243 F.3d 610, 617-23 (2d Cir. 2001);

*Towers v. State Univ. of N.Y. at Stony Brook*, No. CV-04-5243, 2007 WL 1470152, at *1-2 (E.D.N.Y. May 21, 2007).

Accordingly, to the extent that it seeks dismissal of Santana's racial discrimination claims for insufficient pleadings, defendants' motion is denied.

2. *Section 1983*

In addition to their insufficiency-of-the-pleadings argument as to all discrimination claims, defendants seek dismissal specifically of Santana's section 1983 claim for lack of personal involvement, as well as for failure to show municipal liability. (*See* Dkt. No. 23, Attach. 1 at 14-15, 18-19.) The court is not persuaded by either argument.

Despite defendants' contention to the contrary, Santana's pleading is replete with allegations of personal involvement by Radke in the purported deprivation of his constitutional rights. (*See generally* 2d Am. Compl.) Similarly, Santana has alleged that the deprivation of his rights resulted from a discriminatory "custom, practice and policy" engaged in and perpetuated by Ithaca, and has set forth facts which, taken as true, are sufficient at this stage of the litigation to state a plausible cause of action against the municipality. (2d Am. Compl. ¶¶ 38-41); *see Hartline v. Gallo*,

546 F.3d 95, 103 (2d Cir. 2008) ("To prevail against a municipality on a [section] 1983 claim, a plaintiff must demonstrate both an injury to a constitutionally protected right and that the injury was caused by a policy or custom of the municipality or by a municipal official responsible for establishing final policy." (internal quotation marks and citations omitted)).

3. *Failure to Exhaust Administrative Remedies*

Defendants argue next, in a cursory fashion, that "[a]nything [Santana] failed to include in his EEOC charge should be dismissed." (Dkt. No. 23, Attach. 1 at 13-14.) In light of the limited record presently before the court, however, and the fact that claims "not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency," *Breedlove v. Cabou*, 296 F. Supp. 2d 253, 275 (N.D.N.Y. 2003), dismissal on exhaustion grounds is inappropriate at this juncture.

B. **Ithaca Municipal Code (IMC) Gender Discrimination Claims**

Next, defendants argue, and the court agrees, that Santana's claims of gender[5] discrimination require dismissal. (*See* Dkt. No. 23, Attach. 1 at

---

[5] In counts five and six of his Second Amended Complaint, Santana alleges that he was discriminated against because of his "sex gender." (2d Am. Compl. ¶¶ 130, 135.) Although it is unclear whether Santana

11

12-13.) The crux of Santana's gender-based claims is that, in selecting an arbitrator who purportedly shares the same sexual orientation as Radke, Ithaca denied Santana his right to "avoidance of conflict," and discriminated against him because of his "sex gender," all in violation of sections 55 and 215 of the IMC. (2d Am. Compl. ¶¶ 121-136; Dkt. No. 23, Attach. 1 at 13.) Though Ithaca contends that Santana's allegations regarding the arbitrator's sexual orientation are "openly known to be untrue," even when credited, they plainly fail to allege any wrongdoing or discrimination on the part of the city. (Dkt. No. 23, Attach. 1 at 13.) Outside of these allegations, which defendants' aptly characterize as being based on "assumptions that are sexist themselves," (*id*.), Santana's pleading is entirely devoid of any facts which suggest that he was discriminated against because of his gender. (*See generally* 2d Am. Compl.) As such, defendants' motion to dismiss Santana's IMC claims is granted.

### C. Official Capacity Claims

---

seeks to allege gender or sexual orientation discrimination, or both, this ambiguity is immaterial as his claim is fatally flawed under either characterization. Accordingly, for the sake of consistency and clarity, the court refers to the allegations contained in counts five and six as "gender" claims.

Next, defendants argue that the claims against Radke in her official capacity should be dismissed as redundant. (*See* Dkt. No. 23, Attach. 1 at 18.) The court agrees.

"Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." *Philips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012); *see Zachary v. Clinton Cnty., N.Y.*, No. 1:01CV1281, 2003 WL 24197685, at *1 (N.D.N.Y. Jan. 10, 2003). Because Ithaca is a named defendant, the claims against Radke in her official capacity are redundant, and are therefore dismissed.

## C. Collateral Estoppel

Although defendants concede that Santana "is not barred entirely from bringing this discrimination lawsuit," they contend that "many of his claims" are precluded by a final and binding arbitrator's award which found that he was "terminated for just cause." (Dkt. No. 23, Attach. 1 at 16-17.) Because the impact, if any, of the arbitration award on Santana's claims may depend on the terms of the collective bargaining agreement, *see 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 260-64 (2009), defendants'

13

collateral estoppel argument is denied as premature.

## D. Aiding and Abetting

Finally, defendants argue that Santana's claim against Radke under the "aiding and abetting" provision of N.Y. Exec. Law § 296(6) must fail because she could not have aided or abetted her own alleged conduct. (Dkt. No. 23, Attach. 1 at 17-18.) In stating this proposition as law, however, defendants fail to acknowledge that a disagreement exists between the district courts of this Circuit on the question of whether "an individual can be held liable as an aider and abettor even though it was primarily her actions that make the employer liable." *MacBain v. Smiley Brothers Inc.*, No. 1:10-CV-1561, 2013 WL 621932, at *13-14 (N.D.N.Y. Feb. 19, 2013) (collecting cases). In light of defendants' failure to address this salient question, their motion on this point, though it may be renewed at a later date with adequate legal argument, is denied.

## V. Conclusion

In sum, Santana's Title VII, 42 U.S.C. §§ 1981 and 1983, and NYSHRL claims of disparate treatment and hostile work environment based on race survive, while his claims of gender-based discrimination

under the IMC are dismissed.[6]

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 23) is **GRANTED in part** and **DENIED in part** as follows:

**GRANTED** as to Santana's claims of gender-based discrimination under the IMC and all claims against Radke in her official capacity; and

**DENIED** as to Santana's claims of race-based discrimination under Title VII, 42 U.S.C. §§ 1981 and 1983, and NYSHRL; and it is further

**ORDERED** that Santana's claims of gender-based discrimination under the IMC and all claims against Radke in her official capacity are **DISMISSED**; and it is further

---

[6] Defendants argue that Santana's "only cause of action brought under federal law is his claim for discrimination based on sex and/or gender," and that if that claim is dismissed, the court should decline to exercise jurisdiction over Santana's remaining state law claims. (Dkt. No. 23, Attach. 1 at 16.) Although Santana's gender claims fail, defendants' argument is flawed for two reasons. First, Santana alleges racial discrimination in violation of Title VII and sections 1981 and 1983. Second, his claims of gender discrimination allege violations of the IMC, not federal law. Additionally, defendants' objections to certain aspects of Santana's damage request are denied as premature. (*See id*. at 19.)

**ORDERED** that defendants file the appropriate responsive pleadings within the time allotted by the rules; and it is further

**ORDERED** that the parties notify Magistrate Judge Baxter in order to schedule further proceedings in accordance with this order; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

May 1, 2013
Albany, New York

*Gary L. Sharpe*
Chief Judge
U.S. District Court