**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RAMON SANTANA,**

                     **Plaintiff,**                **5:12-cv-625**
                                                 **(GLS/ATB)**

        **v.**

**CITY OF ITHACA, NEW YORK**
**et al.,**

                     **Defendants.**
_____

**APPEARANCES:**                **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Ramon Santana
Pro Se
604 Spencer Road
Ithaca, NY 14850

**FOR THE DEFENDANTS:**
Bond, Schoeneck Law Firm      SUBHASH VISWANATHAN,
One Lincoln Center             ESQ.
Syracuse, NY 13202

Office of the City Attorney       KRIN M. FLAHERTY, ESQ.
108 East Green Street
Ithaca, NY 14850

**Gary L. Sharpe**
**Chief Judge**

# MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff *pro se* Ramon Santana commenced this action against defendants City of Ithaca, New York and Ithaca Building Commissioner Phyllis Radke, alleging violations of Title VII,[1] 42 U.S.C. §§ 1981 and 1983, and the New York State Human Rights Law (NYSHRL)[2].[3] (2d Am. Compl., Dkt. No. 22.) Pending is defendants' motion for summary judgment. (Dkt. No. 49.) For the reasons that follow, the motion is granted.

## II. Background

### A. Facts[4]

_____

[1] *See* 42 U.S.C. §§ 2000e-2000e-17.

[2] *See* N.Y. Exec. Law §§ 290-301.

[3] Santana also initially brought gender-based claims under Chapters 55 and 215 of the City of Ithaca Municipal Code (IMC). (*See generally* 2d Am. Compl.)

[4] Defendants contend that Santana has not complied with this District's Local Rule 7.1(a)(3), and urge the court to accept their statement of material facts as true. (Dkt. No. 56 at 3-5.) While the court, at first blush, is reluctant to impose such a disadvantage on a *pro se* plaintiff who earnestly endeavored to comply with the rules, after reviewing Santana's response, it is clear that he has not cited record evidence to support his "disputed" facts.
    Indeed, defendants submitted an L.R. 7.1(a)(3) statement containing seventy-seven statements of fact, and each fact is properly supported by citations to the record. (Defs.' Statement of Material Facts (SMF), Dkt. No. 49, Attach. 4, ¶¶ 1-77.) In response, Santana disputed, in whole or in part, over half of defendants' statements of fact. (Dkt. No. 55, Attach. 3.) For many of those disputes, however, Santana provides no citation, or simply objects on the grounds of "hearsay." (*See, e.g.*, *id.* ¶¶ 14, 19, 29, 34, 35, 36, 39, 46, 47, 51, 52, 53, 59.) Several other "disputed" facts for which Santana does provide a citation include citations to documents that are outside of the record, such as briefs that he filed in connection with earlier motions, (Dkt. No. 55, Attach. 16), a post-hearing arbitration brief filed in connection with a grievance that his union filed after his termination, (Dkt. No. 55, Attach. 8), and other

In July 2001, Santana, a Hispanic male, began his employment with the City. (Defs.' Statement of Material Facts (SMF) ¶ 1, Dkt. No. 49, Attach. 4.) In April 2004, Santana applied for a permit clerk position in the City's Building Department; along with his application, he submitted a completed questionnaire, on which he voluntarily identified himself as Hispanic. (*Id.* ¶¶ 2, 3, 4; Dkt. No. 49, Attach. 1 at 20.) Radke interviewed Santana and the other applicants, and ultimately made the decision to hire Santana on a provisional basis. (Defs.' SMF ¶ 5.) At the end of Santana's probationary period, Radke recommended that Santana be retained as a

---

unauthenticated documents, (*see, e.g.*, Dkt. No. 55, Attach. 7 at 1-29, 33; Dkt. No. 55, Attach. 11 at 12-23, 26). (*See, e.g.*, Dkt. No. 55, Attach. 3 ¶¶ 16, 17, 22, 24, 26, 30, 31, 33, 37, 40, 41, 42, 43, 50, 54, 55, 57, 63, 68, 75); *see also* Fed. R. Civ. P. 56(c)(1)(A); N.D.N.Y. L.R. 7.1(3) (defining the record for purposes of the statement of material facts as including the pleadings, depositions, answers to interrogatories, admissions and affidavits). Moreover, the few citations to documents produced by defendants do not actually support, or are irrelevant to, the grounds on which Santana disputes defendants' stated facts. (Dkt. No. 55, Attach. 3 ¶¶ 18, 25, 28, 45, 58, 64.) Further, also in his response to defendants' statement of material facts, Santana often provided additional facts, but either does not provide a corresponding citation to the record, or provides a citation that does not support his statement. (*See, e.g., id.* ¶¶ 23, 26.)

Although Santana made an effort to comply with L.R. 7.1(a)(3), he has failed to dispute facts based on admissible record evidence. Accordingly, after searching the record itself, and finding no evidentiary support for Santana's disputed facts, the court accepts defendants' statement of material facts as true. *See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); *Osier v. Broome Cnty.*, 47 F. Supp. 2d 311, 317 (N.D.N.Y. 1999) (deeming admitted all facts in defendants' Rule 7.1(a)(3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record"). Nevertheless, where necessary and relevant, the court addresses certain of Santana's disputed facts, and the documents cited in support thereof.

permanent permit clerk, evaluated his performance as "outstanding," and gave him a perfect evaluation score.  (*Id.* ¶ 6; Dkt. No. 49, Attach. 1 at 24-25.)

### 1.    Promotion to Housing Inspector

In July 2006, Santana applied for a promotion to the position of housing inspector.  (Defs.' SMF ¶ 7.)  Housing inspectors are responsible for inspecting rental properties within their assigned territory, identifying housing code violations, conducting re-inspections to determine whether violations have been remedied, and issuing certificates of compliance to property owners.  (*Id.* ¶ 10; Dkt. No. 49, Attach. 1 at 27-28.)  Again, Radke interviewed Santana for the position, made the decision to hire him, and eventually appointed him as a permanent housing inspector.  (Defs.' SMF ¶¶ 8, 9.)

Santana, along with two other housing inspectors, William Holtkamp and Gary Checksfield, was responsible for the more than 11,000 rental units in the City, which includes single and two-family dwelling units, multiple dwelling units, fraternity and sorority houses, and dormitories.  (*Id.* ¶¶ 12, 14.)  For inspection purposes, the City is divided into three territories—west, east, and Cornell University—and each territory contains

approximately the same number of rental units.  (*Id.* ¶ 15.)  The east and west territories are composed of roughly the same number of single, two-family, and multiple dwelling units, while the Cornell territory contains many fraternity and sorority houses and dormitories.  (*Id.* ¶ 16.)  Santana was assigned to the west territory.  (*Id.* ¶ 17.)

    2.    *Performance Issues Throughout 2009 and 2010*

Beginning in 2009, Santana's job performance began to deteriorate. First, in January 2009, in violation of the City's Vehicle Usage Policy, Santana drove his City vehicle to his home during working hours to check on his children, but then fell asleep, and remained at home for approximately three hours.  (*Id.* ¶¶ 20-22; Dkt. No. 49, Attach. 3 at 16-18.) Radke informed Santana that this conduct was unacceptable and sent the wrong message to City residents.  (Defs.' SMF ¶ 23.)  Also in early 2009, Gino Leonardi, Santana's direct supervisor, learned that Santana was not promptly notifying property owners of code violations or timely responding to inquiries from property owners, resulting in delays in generating certificates of compliance.  (*Id.* ¶ 24.)  Leonardi also noticed that Santana

often had stacks of property files in his office and was disorganized.[5]  (*Id.* ¶

25.)  Leonardi spoke with Santana about these issues, and both Leonardi

and Radke had a counseling session with him, specifically to discuss his

unsatisfactory job performance and their expectations for improvement; the

conversation was summarized in a counseling letter from Radke to

Santana.  (*Id.* ¶¶ 26-27; Dkt. No. 49, Attach. 1 at 39-40.)  Soon thereafter,

Radke wrote another counseling memo to Santana regarding his failure to

comply with policy regarding obtaining approval before taking

compensatory time.  (Defs.' SMF ¶ 28; Dkt. No. 49, Attach. 1 at 42-43.)

Throughout the rest of 2009, Radke and Leonardi had two more

counseling sessions with Santana regarding his poor performance and lack

of improvement; specifically, he was not completing his work in a timely

manner, was not inspecting a sufficient number of units, and was making

an inordinate number of errors.  (Defs.' SMF ¶¶ 30, 32.)  Indeed, many of

these meetings and discussions were prompted by letters written by

property owners voicing dissatisfaction and frustration with Santana's

delays; one property owner explained that Santana's delay in issuing a

_____

[5] While Santana attributes the delays and backlog to faulty software and defendants'
unreasonable refusal to grant him compensatory time, which would permit him to make up
work on Saturdays, he fails to cite any admissible evidence supporting this argument.  (Dkt.
No. 55, Attach. 3 ¶ 25; Dkt. No. 55, Attach. 16 at 8.)

certificate of compliance was causing him to "los[e] money" "[w]ith each day." (*Id.* ¶ 29; Dkt. No. 49, Attach. 1 at 46.)  Santana was also underperforming compared to his colleagues: as of June 30, 2009, Santana had inspected only 340 units, while Holtkamp and Checksfield had inspected 1,183 and 691 units, respectively.  (Defs.' SMF ¶ 35; Dkt. No. 49, Attach. 1 ¶ 21.)  Santana's subpar performance throughout 2009—which included canceling inspections, failing to show up for other inspections or issue certificates of compliance in a timely fashion, leaving work for several hours without any explanation, and making multiple errors in his inspection reports—resulted in a formal letter of reprimand issued in December 2009. (Defs.' SMF ¶¶ 31, 37-42, 46; Dkt. No. 49, Attach. 1 at 48-54.)

Beginning at the end of 2009, and continuing into 2010, Leonardi began meeting with Santana on a weekly basis to review the status of Santana's housing inspections and to confirm that he was properly entering information into his Groupwise calender and Filemaker program.  (Defs.' SMF ¶ 45.)  During these meetings, Leonardi discovered that Santana's inspection reports were riddled with errors, which delayed the issuance of certificates of compliance.  (*Id.* ¶ 46.)  In February and March 2010, Radke and Leonardi again met with Santana, along with his union representative,

to discuss Santana's continued performance deficiencies, articulate and explain their expectations, and devise a plan for improvement. (*Id.* ¶ 48; Dkt. No. 49, Attach. 1 at 58-64.) After failing to show improvement, Radke issued a notice of discipline to Santana on June 14, 2010, and fined him the equivalent of four days of pay. (Defs.' SMF ¶¶ 51-52; Dkt. No. 49, Attach. 1 at 66-69.) The notice of discipline explained that, despite the established goal that eighty percent of Santana's inspection reports contain no errors or omissions, Santana's success rate was only between twenty-two and forty-three percent. (Dkt. No. 49, Attach. 1 at 67.)

Following the June 2010 notice of discipline, Radke and Leonardi began to notice that an unusually high percentage of units that Santana inspected were identified as having no violations, and they suspected that Santana was conducting less thorough inspections so that he could expedite the process, and avoid the additional time and paperwork associated with citing violations and re-inspecting properties. (Defs.' SMF ¶¶ 56-58.) Leonardi then began accompanying Santana on housing inspections, and noticed that Santana often missed visible code violations, or cited violations that were not actually violations. (*Id.* ¶¶ 59-62.) These errors, along with Santana's non-responsiveness, resulted in complaints

from property owners.  (*Id.* ¶¶ 63-64.)  One such complaint was from a property owner who was attempting to sell her deceased mother's home; the property owner explained that Santana failed to return telephone calls, mailed information to the wrong address, provided inaccurate information, lied to her, and was unprofessional in his communications with her.  (*Id.* ¶ 64; Dkt. No. 49, Attach. 1 at 71-73.)  The letter of complaint concluded with the property owner stating that Santana "total[ly] lack[ed] . . . customer service skills as well as . . . knowledge of the codes."  (Dkt. No. 49, Attach. 1 at 73.)

### 3.    *Santana's Administrative Leave and Termination*

In August 2010, Radke placed Santana on paid administrative leave. (Defs.' SMF ¶ 67.)  While Santana was on administrative leave, Radke conducted inspections of several properties that Santana had previously inspected, and for which he reported no violations.  (*Id.* ¶ 68.)  In conducting these investigations, Radke found multiple visible violations. (*Id.*)  In September 2010, Radke issued a final notice of discipline to Santana, which terminated his employment.  (*Id.* ¶ 69; Dkt. No. 49, Attach. 1 at 77-83.)  After a two-day arbitration hearing, the arbitrator concluded that Santana's termination was supported "with unequivocal and

substantial evidence" and that Santana was terminated for "just cause." (Defs.' SMF ¶¶ 71, 74; Dkt. No. 49, Attach. 1 at 89-112.)

Santana filed an administrative charge with the Equal Employment Opportunity Commission (EEOC) on September 7, 2011.  (Dkt. No. 49, Attach. 3 at 57.)  Thereafter, the EEOC issued a right to sue letter.  (Dkt. No. 1, Attach. 1 at 8.)

## B.  <u>Procedural History</u>

Santana commenced this action on April 12, 2012.  (*See generally* Compl., Dkt. No. 1.)  Thereafter, defendants filed a pre-answer motion to dismiss, (Dkt. No. 23), which was granted in part and denied in part, (Dkt. No. 27).  Specifically, the court dismissed Santana's gender-based claims, which he brought pursuant to Chapters 55 and 215 of the City of Ithaca Municipal Code (IMC), and Santana's claims against Radke in her official capacity.  (Dkt. No. 27.)  Following joinder of issue, (Dkt. No. 29), defendants moved for summary judgment, (Dkt. No. 49).  That motion is currently pending before the court.

## III.  <u>Standard of Review</u>

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here.  For a full discussion of the

standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV. <u>Discussion</u>

### A. <u>Title VII Claims</u>

First, defendants contend that Santana's Title VII claims must be dismissed for lack of subject matter jurisdiction because Santana failed to file a timely EEOC charge. (Dkt. No. 49, Attach. 5 at 4.) In response, Santana argues that his EEOC charge was timely filed under the continuing violation theory. (Dkt. No. 55, Attach. 4 at 6-8.) The court agrees with defendants.

In New York, "a plaintiff must file administrative charges with the EEOC within 300 days of the alleged discriminatory acts to comply with the statutory period set by 42 U.S.C. § 2000e-5(e)(1)." *MacDonnell v. Liberty Cent. Sch. Dist.*, 115 F. App'x 489, 490 (2d Cir. 2004) (citing *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 133 (2d Cir. 2003)). Under the continuing violation exception, however, "a plaintiff who files a timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination extends the limitations period for all claims

11

of discriminatory acts committed under that policy even if those acts, standing alone, would have been barred by the statute of limitations." *Id.* at 490-91 (internal quotation marks and citation omitted).

Here, the last alleged racially discriminatory act, Santana's termination, occurred on September 30, 2010.  (Defs.' SMF ¶ 69; Dkt. No. 49, Attach. 1 at 77-83.)  On September 7, 2011, some 342 days later, Santana filed his administrative charge with the EEOC.  (Dkt. No. 49, Attach. 3 at 57.)  Santana, however, contends that the 300-day period should be tolled until after the March 28-29, 2011 arbitration proceeding, because the arbitrator selection process constituted sex discrimination and "violated [his] right to a fair and impartial hearing."  (Dkt. No. 55, Attach. 4 at 6-8.)

First, as defendants point out, (Dkt. No. 56 at 1), "the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods."  *Cherry v. City of N.Y.*, 381 F. App'x 57, 58-59 (2d Cir. 2010) (internal quotation marks and citation omitted).  Second, the court has already dismissed Santana's gender discrimination claims, and, in doing so, noted that "Santana's

pleading is entirely devoid of any facts which suggest that he was discriminated against because of his gender." (Dkt. No. 27 at 11-12.) The court, therefore, declines to allow Santana's meritless gender discrimination claims to save his untimely race discrimination claims. *See Roberts v. Cnty. of Nassau*, 140 F. App'x 277, 279 (2d Cir. 2005) ("Discrete acts of discrimination occurring outside the Title VII limitations period for filing an administrative complaint are not actionable on the theory that a different act of discrimination occurred within the limitations period." (citing *Nat'l R. R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002)). In any event, even if Santana's Title VII claims are not barred, they fail on their merits for substantially the same reasons that his § 1981, § 1983, and NYSHRL claims fail, as articulated below.

## B. Discrimination Claims Pursuant to 42 U.S.C. §§ 1981 and 1983, and NYSHRL

### 1. Timeliness

First, defendants contend that Santana's race discrimination claims pursuant to § 1981, § 1983, and the NYSHRL are time-barred. (Dkt. No. 49, Attach. 5 at 4-5.) Santana again argues that his previously-dismissed gender discrimination claims resurrect any otherwise untimely race

discrimination claims.  (Dkt. No. 55, Attach. 4 at 8.)  The court agrees with

defendants that some of Santana's claims are untimely, but, ultimately, the

facts that support the untimely claims are relevant to the timely claims.

The statute of limitations period in New York for discrimination claims

under § 1983 and the NYSHRL is three years.  28 U.S.C. § 1658(a);  *see*

*Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997); N.Y. C.P.L.R. § 214(2).

For § 1981 discrimination claims, the statute of limitations period is four

years. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382-83

(2004).  As noted above, discrete discriminatory acts are not actionable if

time-barred.  *See Morgan*, 536 U.S. at 102.

Here, Santana filed his complaint on April 12, 2012.  Accordingly, he

may not, under § 1983 and the NYSHRL, recover for any discriminatory

acts that occurred prior to March 13, 2009, and, he also may not, under

§ 1981, recover for any discriminatory acts that occurred prior to March 13,

2008.  However, to the extent that any discrete acts are time-barred, they

can still serve as background evidence for Santana's timely discrimination

claims.  *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir.

2012); *DeNigris v. N.Y.C. Health & Hosps. Corp.*, 861 F. Supp. 2d 185,

191-92 (S.D.N.Y. 2012).

*2.    Merits*

In his second amended complaint, Santana alleges that he was discriminated against on the basis of his race because he was assigned a greater caseload than were his Caucasian colleagues, denied compensatory time while his Caucasian counterparts were not, reprimanded and terminated under unequal disciplinary standards, and subjected to racially-charged language by Radke and Leonardi.  (2d Am. Compl. ¶¶ 8, 10, 12, 14, 15, 18, 19, 20, 22, 27, 29-31, 32-35, 65-66.) Defendants contend that Santana's race discrimination claims fail on their merits because, even if Santana can establish a *prima facie* case of discrimination, defendants have articulated legitimate, non-discriminatory reasons for disciplining and terminating him, which he has not proven were pretextual.  (Dkt. No. 49, Attach. 5 at 5-20.)  Santana responds that his race discrimination claims are legally sufficient.  (Dkt. No. 55, Attach. 4 at 8-17.)  The court agrees with defendants.

Claims of employment discrimination brought under 42 U.S.C. §§ 1981 and 1983, and NYSHRL are subject to a largely identical analytical framework.  *See Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012); *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010); *see*

*also Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 224-27 (2d Cir. 2004) (articulating differences between Title VII and sections 1981 and 1983). To state a prima facie discrimination claim, the plaintiff must show that: "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz*, 609 F.3d at 491-92.

"A plaintiff's establishment of a *prima facie* case gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a legitimate, nondiscriminatory reason for the challenged employment action." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (internal quotation marks and citations omitted). If the defendant proffers a legitimate, nondiscriminatory reason for the challenged employment action, the presumption of discrimination drops out of the analysis, and the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

Ultimately, once the burden shifts back to the plaintiff, he must show,

"without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). The plaintiff must demonstrate "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). This showing may be made "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *see Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180-81 (2d Cir. 1992). However, conclusory allegations of discrimination are insufficient to defeat a motion for summary judgment. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

Here, assuming, without deciding, that Santana has established a *prima facie* case of discrimination, it is clear that defendants had a legitimate, non-discriminatory basis to discipline and eventually terminate him, namely, his work performance. *See Davis v. Avaya, Inc.*, 295 F. App'x 380, 381-82 (2d Cir. 2008) (noting that "poor performance" constitutes a legitimate, non-discriminatory reason for termination). Indeed, as

discussed at length above, record evidence demonstrates that Santana's job performance began to decline in early 2009, and despite Radke and Leonardi's efforts to counsel and aide him, he showed no signs of improvement.  (Dkt. No. 49, Attach. 1 ¶¶ 19, 20, at 42-43, 48-54, 58-64, 66-69; Dkt. No. 49, Attach. 2 ¶¶ 7-8; Dkt. No. 49, Attach. 3 at 16-18.)  From failing to inspect a sufficient number of units, (Dkt. No. 49, Attach. 1 ¶ 19, at 49-51), to making multiple errors in his reports, (Dkt. No. 49, Attach. 1 at 67; Dkt. No. 49, Attach. 2 ¶ 8), and generating complaints from property owners, (Dkt. No. 49, Attach. 1 at 46, 71-73), defendants have demonstrated that they disciplined and terminated Santana due to his poor job performance.

Accordingly, the burden rests with Santana to demonstrate, with record evidence support, that defendants' stated basis for terminating him—his work performance—was a pretext, and that the action taken against him was actually motivated by his race.  *See Holcomb*, 521 F.3d at 138.  As an initial matter, at least with respect to his claims against Radke, establishing pretext is an uphill battle, as Radke made a series of favorable decisions with respect to Santana's employment with full knowledge of his race.  (Dkt. No. 49, Attach. 1 ¶¶ 4-7, at 20, 24-25.)  Indeed, it was Radke

who first hired Santana as a permit clerk, gave him a perfect performance evaluation, referred to him as an "outstanding employee" while he served in that position, and recommended that he be retained as a permanent employee.  (*Id.*)  It was also Radke who interviewed and hired Santana for the position of housing inspector.  (*Id.* ¶ 7.)  This evidence undermines any argument that Radke's stated reason for disciplining and terminating Santana—his poor work performance—was pretext for discrimination.  *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."); *see also Grant v. Cornell Univ.*, 87 F. Supp. 2d 153, 162 (N.D.N.Y. 2000).

Further, while Santana attempts to manufacture a question of fact with respect to defendants' real motivation for disciplining and terminating him, he fails to cite any record evidence to support most of his arguments. For example, in his memorandum of law, Santana states, without evidentiary support, that "he was also being spied on by . . . Leonardi, . . . and other . . . employees," he was informed by another building inspector that "executive staff and other Caucasian employees [were] saying bad

things about [him]," and "Radke hired a number of minority individuals . . ., yet disciplines and discharges those very same individuals for . . . performance issues, while failing to hold Caucasian . . . employees to the same standards." (Dkt. No. 55, Attach. 4 at 10, 14-17.) These speculative and unsupported assertions fail to establish pretext. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (finding that a plaintiff must rebut evidence of legitimate, nondiscriminatory reasons for dismissal with specific evidence tending to show not only that those reasons were a pretext, but that unlawful discrimination was the real reason for the employment decision); *Grady*, 130 F.3d at 561 ("[T]he creation of a genuine issue of fact with respect to pretext alone is not sufficient. There must also be *evidence* that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination." (emphasis added)).

Moreover, although he comes closer, Santana still falls short of demonstrating pretext by identifying certain remarks made by Radke and Leondardi that he perceived as racist. (Dkt. No. 55, Attach. 4 at 8-17.) Specifically, Santana points to three separate incidents. First, Santana alleges that, in 2008, during a staff meeting, Radke said to Santana, "'Ray I

know how "you people" like to go to Burger King on your breaks, I wouldn't want you to get grease on your paperwork.'"  (2d Am. Compl. ¶ 15; Dkt. No. 49, Attach. 3 at 49.)  Second, Santana claims that, in January 2010, after he said to Leonardi, "'Don't you have an obligation to let me present the most accurate updated information possible since my performance is being scrutinized?,'" Leonardi responded, "'I don't have an obligation to do anything for anybody.'"  (2d Am. Compl. ¶ 17; Dkt. No. 49, Attach. 3 at 55.) Third, Santana alleges that, in March 2010, he made modifications to an order to remedy, and after reviewing his changes, Radke made additional changes, and wrote "'POST AS "UNSAFE" THINK!'"  (2d Am. Compl. ¶ 21; Dkt. No. 49, Attach. 3 at 53.)

With respect to these statements, the court appreciates that seemingly neutral language can be infused with discriminatory animus, *see Lloyd v. Holder*, No. 11 Civ. 3154, 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013), and phrases such as "'you people' . . . could just as easily be interpreted as [having] a negative racial connotation," *Wooten v. Reconstruction Home, Inc.*, No. 5:02-cv-01278, 2005 WL 1502149, at *11 (N.D.N.Y. June 24, 2005), especially when the plaintiff provides "greater specificity as to the context of [such phrases'] usage," *Griffin v. Ambika*

*Corp.*, 103 F. Supp. 2d 297, 314 (S.D.N.Y. 2000).  Here, however, the

statements made by Radke and Leonardi do not explicitly conjure racial

hostility, and, more importantly, there is insufficient evidence in the record

for a reasonable juror to conclude that these comments were laced with

racism.  Indeed, regarding Radke's Burger King comment, the only context

that Santana provided was that he "interpreted the statement as offensive

to not only Hispanics but any minority," and, regarding Radke's written

comment on his order to remedy, Santana stated that he construed it to

mean that "somebody of [his] . . . racial background can't think for

themselves."  (Dkt. No. 49, Attach. 3 at 49-51, 53.)  Regarding Leonardi's

comment, Santana simply stated that, "a statement like that shows a . . .

lack of accountability as a supervisor towards one of his employees."  (*Id.*

at 55.)  A plaintiff's "[feelings and perceptions] of being discriminated

against," however, "[are] not evidence of discrimination," and Santana has

otherwise failed to come forth with evidence that lends credence to his

argument that these statements were racially charged.  *Bickerstaff v.*

*Vassar Coll.*, 196 F.3d 435, 456 (2d Cir. 1999) (internal quotation marks

and citation omitted).

Finally, Santana has attempted to demonstrate pretext by arguing

that he was assigned a greater caseload than were the Caucasian building

inspectors, and was denied compensatory time to complete his work, while

his Caucasian counterparts were permitted to work on Saturdays.  (Dkt.

No. 55, Attach. 4 at 8-17.)  First, Santana asserts that he was assigned

more single and two-family residences than the other housing inspectors,

and, therefore, he had to inspect more buildings in order to meet his annual

inspection quota.  (*Id.* at 12-14, 17.)  In support of this argument, however,

Santana has failed to cite admissible record evidence, and, further, the

documents that he does cite do not support his argument.  For instance,

one unauthenticated document that Santana cited, from what the court can

glean, lists the breakdown of buildings and units for each of the three

territories.  (Dkt. No. 55, Attach. 11.)  While this document appears to show

that Santana's territory, the west territory, had the most number of

buildings, that statistic is irrelevant; the Department of State's housing

inspection expectations are based on the number of dwelling *units*

inspected, not buildings, (Dkt. No. 49, Attach. 1 ¶ 21), and the document

cited by Santana shows that his territory was not, in fact, comprised of the

most units, (Dkt. No. 55, Attach. 11).

Second, Santana contends that he was denied compensatory time

for racially discriminatory reasons, which is further evidence of pretext. (Dkt. No. 55, Attach. 4 at 9, 12.)  This arguement, however, is flawed. Indeed, the record evidence demonstrates that he was denied compensatory time because he did not follow the department's policy when requesting the time, not because he is Hispanic.  (Dkt. No. 49, Attach. 1 at 43.)  Moreover, Santana himself submitted a document, which appears to be an email from Radke to Santana, in which Radke reiterated that Santana was not following the proper policy for requesting compensatory time, and also denied his request for compensatory time because, given his low productivity during the week, she was not confident that he would accomplish much work, unsupervised, on a Saturday.  (Dkt. No. 55, Attach. 5 at 2.)

Accordingly, Santana has failed to demonstrate that defendants' legitimate, non-discriminatory reasons for disciplining and terminating him were prextual.  At best, he simply disagrees with defendants' evaluations of his performance.  A plaintiff's "subjective belief that he was a better performer than his supervisor believed him to be," however, "is insufficient to prove pretext."  *Jaiyeola v. Carrier Corp.*, 562 F. Supp. 2d 384, 390 (N.D.N.Y. 2008), *aff'd* 350 F. App'x 583 (2d Cir. 2009); *Ricks v. Conde*

*Nast Publ'ns, Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000) ("The mere

fact that an employee disagrees with h[is] employer's assessment of h[is]

work . . . cannot standing on its own show that the employer's asserted

reason for termination was pretextual.").  Defendants, therefore, are

entitled to summary judgment on Santana's race discrimination claims.

## C.   Hostile Work Environment

Santana also claims that he was subjected to a hostile working

environment.  (2d Am. Compl. ¶¶ 18, 38, 44-47, 65-66, 80-83, 100-03; Dkt.

No. 55, Attach. 4 at 18-20.)  Defendants contend, and the court agrees,

that Santana has failed to meet the standard of establishing a hostile work

environment.  (Dkt. No. 49, Attach. 5 at 20-23.)

In order to establish a hostile work environment claim ,

> a plaintiff must show that the workplace was so
> severely permeated with discriminatory intimidation,
> ridicule, and insult that the terms and conditions of
> [his] employment were thereby altered.  A hostile
> working environment is shown when the incidents of
> harassment occur either in concert or with a regularity
> that can reasonably be termed pervasive.  The
> plaintiff must show more than a few isolated incidents
> . . . , although a hostile work environment can also be
> established through evidence of a single incident of
> harassment that is extraordinarily severe.

*Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 723-724 (2d

Cir. 2010) (internal quotation marks and citations omitted).  In this regard, the court must not "view individual incidents in isolation," or "view the record in piecemeal fashion," but instead, should consider the "totality of the circumstances, viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances [including] the social context in which particular behavior occurs and is experienced by its target."  *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (internal quotation marks and citations omitted).

Here, Santana bases this claim on the three allegedly discriminatory statements made by Radke and Leonardi, discussed above, *see supra* Part IV.B.2., and the fact that Radke and Leonardi accused him of altering records in January 2010.  (2d Am. Compl. ¶¶ 18, 38, 44-47, 65-66, 80-83, 100-03; Dkt. No. 55, Attach. 4 at 18-20.)  As noted above, the statements made by Radke and Leonardi are facially neutral, and Santana has offered no additional record evidence which would allow the court to read these statements as racially charged.  Moreover, even if the court were to construe Radke and Leonardi's statements and accusations to be somehow related to Santana's race, these isolated incidents do not rise to the level of a hostile work environment.  The Second Circuit has held that

for claims of hostile work environment, the plaintiff "must prove more than a few isolated incidents of racial enmity." *Snell v. Suffolk Cnty.*, 782 F.2d 1094, 1103 (2d Cir. 1986); *see Schwapp*, 118 F.3d at 110 ("[I]nstead of sporadic racial slurs, there must be a steady barrage of opprobious racial comments."). Despite Santana's allegations to the contrary, the record evidence fails to establish that defendants' conduct was sufficiently severe or pervasive to constitute a hostile work environment. Therefore, defendants are entitled to summary judgment on Santana's hostile work environment claim.[6]

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 49) is **GRANTED** and all claims against Radke and the City of Ithaca are **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

_____

[6] Given that all of Santana's remaining claims are either time-barred or fail on their merits, the court need not address defendants' argument that Santana has not established any viable claims against Radke in her individual capacity, (Dkt. No. 49, Attach. 5 at 24-25), and Santana's claim that Radke is individually liable under the "aider and abettor" provision of the NYSHRL, (2d Am. Compl. ¶¶ 102, 114, 115), is dismissed because "liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor," *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999).

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

November 19, 2014
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court